NOT DESIGNATED FOR PUBLICATION

No. 124,911

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Parentage of M.F.,
By and Through K.L.,
*Appellant*,

and

T.F.,
*Appellee*.


MEMORANDUM OPINION


Appeal from Butler District Court; DAVID A. RICKE, judge. Opinion filed December 23, 2022. Affirmed.

*Valerie L. Moore*, of Vinton Moore, of Lenexa, for appellant.

*Christopher J. Vinduska*, of Klenda Austerman LLC, of Wichita, for appellee.

Before ARNOLD-BURGER, C.J., HILL and SCHROEDER, JJ.

PER CURIAM: This is an appeal of an order that denied any relief to the petitioner, K.L., who seeks a court declaration of her parentage of a young girl, M.F. A close examination of the issues she raises reveals that K.L. is asking us to reweigh the evidence and reverse the trial court. This we will not do. We affirm.

The history of this case provides context and perspective. K.L.'s initial petition was denied by the district court. K.L. appealed to this court and the district court's decision was affirmed. Upon review, the Kansas Supreme Court reversed both courts and

1

remanded the case to the district court with directions to use the correct legal test. Upon remand, the district court at first granted relief to K.L. but later reversed its order upon a motion for reconsideration filed by T.F., the birth mother of M.F. We are now considering K.L.'s appeal of that order.

*Once close, this couple slowly parted.*

The record from the trial of this matter is uncontested. K.L. and T.F. were in a committed same-sex relationship from 2007 to 2014. They owned a home and lived together. T.F. always wanted children and began considering artificial insemination in 2012.

They both attended a preinsemination session with social worker Renee Cristiano in November 2012. Cristiano's report said the couple planned to be coparents and that their families supported T.F.'s decision to have K.L. appointed as guardian. T.F. later disputed these statements at trial. T.F. said K.L. went with her to see Cristiano because it was a requirement of insemination if you lived with someone else.

T.F.'s first attempt at artificial insemination failed. T.F. selected the sperm donor on her own, went to the appointments on her own, and did not tell K.L. she was being inseminated. T.F. later testified that the decision to become pregnant was not mutual.

T.F.'s second attempt at artificial insemination was successful. But the parties disagree on how involved K.L. was in the process. K.L. says she helped select the donor because he was Hispanic like her. K.L. was present for the successful procedure. T.F. testified that she alone chose the sperm donor.

A daughter, M.F., was born in October 2013. K.L. was at the hospital with T.F. when M.F. was born. K.L. was given a hospital bracelet that identified her as a parent and the couple provided the hospital a birth plan that said K.L. was the baby's other parent.

The couple had never entered into a written parenting agreement. When M.F. was born, K.L.'s last name was used as a second middle name on the birth certificate. T.F. later testified that she felt pressure from K.L. to use her name. T.L. later unilaterally dropped K.L.'s last name from the baby's name.

In November 2014, T.F.—along with 13-month-old M.F.—moved out of the couple's home in Andover and relocated in Inman, Kansas. K.L. testified that it was hard for her to see M.F. after the move because T.F. did not regularly respond to messages.

T.F. told K.L. that she could come to Inman to see M.F. but did not allow overnight stays. K.L. testified she did not go to Inman to see M.F. often because by the time she got there after work, M.F. would be going to bed. Eventually, T.F. would not let K.L. be around M.F. alone, requiring K.L.'s mother to accompany her.

In 2015, T.F. married and moved with M.F. to Nebraska. Shortly after that, K.L. petitioned the court to establish parentage, custody, visitation, and child support. K.L. asserted that she and T.F. are both M.F.'s mothers and asked the court to establish her maternity. In addition to what we have discussed above, K.L. testified that she and T.F. shared M.F.'s expenses "for the most part" and that after the couple broke up, she always offered to buy things for M.F. when she was at the store.

The record reveals several other points on K.L.'s behalf:

- The couple's former neighbor Kenneth Von Feldt submitted an affidavit that said T.F. and K.L. talked to him about having a baby together both before T.L.

got pregnant and while she was pregnant. Once M.F. was born, both women acted as her mother and T.F. referred to K.L. as "mom," "mommy," or "mama." T.F. also referred to K.L.'s mother as M.F.'s grandmother.

- K.L.'s friend Janet Brown testified that K.L. and T.F. talked about motherhood together before M.F. was born. Brown testified she heard M.F. call K.L. mommy over the phone a week before the trial.

- Dr. Thalia Lopez, the OB/GYN who provided T.F. with prenatal care, testified that K.L. and T.F. presented themselves as a couple having a baby together. Dr. Lopez understood that K.L. was M.F.'s other parent.

- Denise Strickland, a nurse manager at the Birth Care Center where M.F. was born, testified that K.L. was with T.F. the whole time T.F. was in labor. The couple also used K.L.'s last name as one of M.F.'s middle names.

- Jolinda Kelley testified that before T.F. was pregnant, she talked to T.F. and K.L. about the artificial insemination process because she had been through it. Kelley testified that the couple talked about parenting together and after M.F. was born, T.F. told Kelley she wanted another child but K.L. was satisfied with one. She testified that T.F. and K.L. introduced M.F. as their daughter and she had no doubt they were a family.

- K.L. admitted into evidence the following:
  - A Mother's Day card T.F. had given her while T.F. was pregnant. T.F. wrote, "You will be a great mother."
  - A birthday card T.F. had given to her while T.F. was pregnant. T.F. addressed the card from "Little Feather,"—their nickname for M.F.—to "Mama K." The card read, "To My Mommy: I have two little arms and know just what they're for . . . hugging the Mommy I love and adore! Happy birthday from your little girl."

T.F. testified that she was M.F.'s only parent and she never presented K.L. as a coparent; K.L. was never M.F.'s mother. She said K.L. was her best friend and like an

4

aunt to M.F. She testified K.L. never had financial responsibility for M.F. and she did not know K.L. claimed to be a parent until she was served with K.L.'s petition. T.F. testified that she never wanted K.L.'s last name on the birth certificate and K.L. never used M.F.'s full name anyway so T.F. legally changed it.

T.F. testified that the year she and M.F. lived in Inman there was an open invitation for K.L. to visit M.F. and she visited only two times. T.F. presented evidence that she paid for the insemination and related costs, her and M.F.'s medical bills, and M.F.'s childcare.

T.F. testified about the Mother's Day card she sent K.L. while T.F. was pregnant. She said that she was trying to encourage K.L. to support the idea of T.F. having a baby, not represent that K.L. was a parent. T.F. said she called her "Mama K" because when she worked in an orphanage in Guatemala, all the women there were called "Mama" by the children.

T.F.'s witnesses testified as follows:

- Emily McVay testified that she considered T.F. the sole parent of M.F. She said only T.F. took care of M.F. and that M.F. never called K.L. "mom" or "mommy."
- Edward Eagan, T.F.'s former boss, testified that T.F. told him K.L. did not help pay for M.F.'s care and if anything happened to T.F. her parents would take care of M.F.
- Staci Eddy, M.F.'s daycare provider when she and T.F. lived in Inman, testified that she never knew K.L. as a parent of M.F. and K.L. never brought her to daycare.
- T.F.'s friend Elizabeth Avelar Hardyway testified that K.L. did not want to have a child because she was older than T.F. and felt that time in her life had

5

passed. Hardyway testified that there was a baby shower thrown only for T.F. when she was pregnant. She said that when T.F. was pregnant, T.F. told her she would make sure she was the only parent listed on M.F.'s birth certificate.

- T.F.'s sister, K.V., testified that she and T.F. discussed in the past that K.L. did not want to have a child. She testified that M.F. never called K.L. "mama" or "mommy" and that T.F. was solely responsible for parenting and financially supporting M.F.

The district court ruled for T.F. The court held that there was insufficient evidence to find a parent/child relationship between M.F. and K.L. and denied her relief. The matter was then reviewed by a panel of this court. The panel rejected K.L.'s arguments and affirmed the district court's decision. *In re Parentage of M.F.*, No. 117,301, 2019 WL 2399482, at *8 (Kan. App. 2019) (unpublished opinion).

That decision was reversed by the Supreme Court in *In re Parentage of M.F.*, 312 Kan. 322, 353, 475 P.3d 642 (2020). After giving a background on the Kansas Parentage Act and the line of cases stemming from *Frazier v. Goudschaal*, 296 Kan. 730, 295 P.3d 542 (2013), the Supreme Court laid out the following formula for how the district court should have handled the parentage case:

> "K.L. seeks judicial recognition of her legal parentage relationship with M.F. . . . She wants to employ the legal fiction permitted through the KPA by invoking the presumption in subsection (a)(4) of K.S.A. 2019 Supp. 23-2208, because she 'notoriously . . . recognize[d]' her maternity of M.F. If she can succeed in demonstrating that this presumption arose, then, under subsections (b) and (c), T.F. must rebut the presumption by clear and convincing evidence that no such legal relationship ever existed or by showing the district judge a court decree establishing paternity or maternity of another individual or by invoking a competing presumption under (c). If T.F. succeeds using one of these methods to rebut the initial presumption in K.L.'s favor, then K.L. bears the burden of going forward with evidence." *In re M.F.*, 312 Kan. at 349.

The Supreme Court agreed with K.L. that the district court erred in applying the Parentage Act:

> "It simply was not necessary that [K.L.] demonstrate she was an attentive, hands-on, involved mother. Rather, she had to show that she notoriously recognized her maternity, including the rights it would give her and the duties it would impose on her. The two courts' focus, under that statutory language that our Legislature has not seen fit to change, needed to be on whether K.L. had qualified as one of M.F.'s two parents, not on whether she had later turned out to be a model of parenting success." *In re M.F.*, 312 Kan. at 350.

The Supreme Court explained that, in line with *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), along with finding a presumption of maternity, the court must also be persuaded that the birth mother, at the time of the child's birth, consented to share her due process right to decision making about her child's care, custody, and control with the woman claiming parentage under the KPA. *In re M.F.*, 312 Kan. 322, Syl. ¶ 5. The Supreme Court reversed and remanded the case to the district court to look at the evidence by using the analysis pattern it had provided. 312 Kan. at 350.

*After remand, the district court reviewed the evidence and at first ruled in K.L.'s favor.*

The district court obeyed the Supreme Court's mandate. Both parties agreed there was no need to present any more evidence. This time the district court found that K.L. had met her burden to show she notoriously recognized maternity of M.F. when she was born and thus established a presumption of maternity under K.S.A. 23-2208(a)(4).

The court then ruled that T.F. had to rebut the presumption by one of the methods found in K.S.A. 23-2208(b) and (c). The court held that T.F. could not rebut the presumption for these reasons:

7

- "[T.F.] was not married to, or cohabitating with another man (or woman) during her pregnancy or at the time the child was born;
- "No other person openly and notoriously recognized or voluntarily acknowledged their parentage in writing or otherwise at the time that M.F. was born;
- "No court decree establishing conflicting parentage was produced at the trial; and
- "No duty of another person to support M.F. was established at [*sic*] by trial evidence."

The district court then analyzed whether T.F. consented to share parenting with K.L. at the time of M.F.'s birth. The district court found that T.F. consented to K.L.'s maternity and some degree of shared parenting when M.F. was born. It was not of consequence that T.F. took many steps after M.F.'s birth to revoke or otherwise limit that consent because the Kansas Supreme Court required the district court to focus on the status quo at the time of M.F.'s birth. The district court relied on these facts when reaching its decision:

- The couple was in a long-term committed relationship and discussed having children together.
- K.L. attended a preinsemination meeting with social worker Renee Cristiano. Cristiano's report stated the couple planned to be coparents.
- K.L. attended the second, successful insemination procedure. The couple selected a sperm donor together and chose a Hispanic man, ostensibly because K.L. is Hispanic.
- The couple's neighbor Kenneth Von Feldt testified that they planned to parent together and T.F. called K.L. "mom" and "mommy."
- K.L.'s last name was included on M.F.'s birth certificate as a second middle name.
- K.L. attended childbirth classes with T.F.
- T.F.'s written birth plan identified K.L. as M.F.'s other parent.

- T.F. sent K.L. Mother's Day and birthday cards from M.F. before and after her birth, with the cards referring to K.L. as "Mama K" and "Mother."

Noting that over five years had passed since the case was first filed, and that K.L. and M.F. were separated during that time, the district court ordered their slow reintegration and granted T.F. temporary sole legal custody.

*The court then modified its prior ruling on T.F.'s motion to reconsider.*

T.F. moved to reconsider the district court's September 2021 ruling and argued that the court erred by finding she could only rebut the presumption under K.S.A. 23-2208(c), or by providing a court decree establishing paternity of someone other than K.L. T.F. argued there was a third avenue by which she could rebut the presumption of maternity:  by presenting clear and convincing evidence that no such relationship existed, which is not limited to any particular kind of evidence.

T.F. argued that by failing to recognize the third avenue available, the district court misapplied the law and ignored her clear and convincing evidence that rebutted K.L.'s presumption of maternity. T.F. argued that the district court also ignored material evidence that she did not consent to share parentage with K.L. at the time M.F. was born. T.F. then addressed the court's factual findings on the presumption of maternity and laid out all the evidence she presented to rebut those factual findings.

The court heard the motion to reconsider in November 2021. It found for T.F., agreeing that it had failed to analyze whether she rebutted the presumption of maternity by clear and convincing evidence. It found that T.F. had rebutted the presumption by clear and convincing evidence, adopting as facts the points made by T.F. in her memorandum in support of the motion to reconsider. The district court said that the great weight of the witness testimony supported T.F.'s claims that she made the decision to

9

have a child, provided all care for the child, and presented to others that she was the sole parent. The court found that she was more credible in her assertions than K.L.

Recognizing that the burden-shifting analysis was not over, the court explained that K.L. now had an obligation to prove "whether she notoriously recognized her maternity, including the rights it would give her and the duties it would impose upon her, and also, whether [T.F.] had implicitly or explicitly consented to share parenting with [K.L.] at the time of M.F.'s birth."

The district court found that K.L. did not meet her burden to show that she notoriously recognized maternity, including the rights it would give her and the duties it would place upon her. As the court said in its original journal entry of judgment, K.L. did not recognize the right to share parental responsibilities and did not share the responsibilities in practice. It held that "[T.F.] was responsible for the day-to-day parenting of the child and had the financial responsibility for the child." The court reiterated that the decision to have a child was T.F.'s alone and K.L. merely acquiesced. It reviewed the evidence and said, "The truth of the facts that [K.L.] asserted at trial is <u>not</u> found to be more probable than not."

On whether T.F. consented to share parenting rights and responsibilities, the court noted that while some evidence showed that she accepted K.L.'s involvement as a parental figure, K.L. did not show by a preponderance of the evidence that T.F. consented to shared parenting. The court noted that the evidence on T.F.'s consent is highly conflicting and that it gave too much weight to K.L.'s evidence and not enough to T.F.'s on remand. The court set aside its contrary finding in the previous ruling and order.

It offered the following summary of its ruling:

"1. [K.L.] met her initial burden of notoriously recognizing parentage of the minor child M.F.

"2. [T.F.] rebutted [K.L.]'s presumption of maternity by clear and convincing evidence presented at trial.

"3. [K.L.] was unable to overcome that rebuttal by presenting evidence to show that she openly and notoriously recognized parentage and the rights and duties attendant to it at the time of the child's birth.

"4. This court ultimately has not been persuaded that the birth mother [T.F.], at the time of the child's birth, consented to share her due process right to decision-making about her child's care, custody, and control with [K.L.], the woman claiming parentage under the Kansas Parentage Act.

"5. The court's previous Ruling and Order Making a Determination of Maternity Regarding [K.L.] did not appropriately analyze or consider whether [T.F.]'s trial evidence rebutted [K.L.]'s presumption of maternity by clear and convincing evidence or properly apply the burden-shifting analysis required by the Kansas Supreme Court's opinion in this case. Therefore, that previous Ruling and Order is altered, amended, and set aside to the extent that it establishes a mother-child relationship between [K.L.] and the minor child M.F. In addition, paragraphs I, II, and III setting forth orders regarding child custody, support, alternative dispute resolution, and parenting rights are set aside in their entirety.

"6. The court's previous findings and rulings on the issue of [T.F.]'s consent to [K.L.]'s parentage are set aside, this court finding that such rulings did not appropriately contemplate the weight of considerable conflicting evidence presented by [T.F.] and that the court's decision was based on overly-weighted consideration of the evidence favorable to [K.L.] on this issue and therefore was improvidently granted."

K.L. now appeals the district court's ruling on the motion to reconsider, arguing that

(1) the court erred by finding T.F. presented evidence sufficient to rebut her presumption of maternity; and

(2) the court erred by finding that K.L. did not sufficiently rebut T.F.'s rebuttal of her presumption of maternity.

11

*Burdens of proof shift back and forth between the parties in parentage cases.*

The Kansas Parentage Act deals with presumptions that are created by the evidence presented in court by those seeking to acknowledge parentage of a child. The first step for a party seeking legal recognition of her parentage under the Act is to satisfy one of the presumptions in K.S.A. 23-2208(a). The only presumption that may apply in this case—and the one K.L. used—is that the party "notoriously or in writing recognizes [maternity] of the child." K.S.A. 23-2208(a)(4). The Kansas Supreme Court has clarified that the woman must notoriously recognize maternity and the rights and duties attendant to it at the time of the child's birth. *In re M.F.*, 312 Kan. 322, Syl. ¶ 5. But evidence of a party's state of mind before, during, and after the birth may be relevant to the determination. 312 Kan. at 352.

Neither party here argues that K.L., on remand, failed to meet her initial burden to prove a presumption of maternity by showing that she notoriously and openly recognized parentage of M.F. Instead, it is the second and third burden-shifting steps at issue.

If the party seeking a parent-child relationship succeeds, the burden shifts to the other party to rebut the presumption by clear and convincing evidence, by court decree establishing paternity of someone else, or by applying K.S.A. 23-2208(c), when there are competing presumptions. If the presumption is rebutted, the burden shifts back to the party seeking establishment of a parent-child relationship, who then has the burden of going forward with the evidence and proving a parent-child relationship by a preponderance of the evidence. K.S.A. 23-2208(b); *In re M.F.,* 312 Kan. at 341-42.

The court must also be persuaded that the birth mother, at the time of the child's birth, consented to share her due process right to decision making about her child's care, custody, and control with the woman claiming parentage. *In re M.F.*, 312 Kan. 322, Syl.

¶ 5. A birth mother's consent to share parenting may be implicit or explicit, proved by direct or circumstantial evidence. *In re M.F.,* 312 Kan. at 352.

*T.F. presented sufficient evidence to rebut K.L.'s presumption of parentage.*

K.L. argues that the district court erred when it found that T.F. rebutted her presumption of maternity. She points out that the court's findings of fact on remand conflict with many findings of fact in its ruling on the motion to reconsider. She complains that the district court only reviewed its findings of fact as they pertained to T.F.'s memorandum in support of the motion to reconsider.

K.L. argues this is wrong for three reasons:
(1) The memorandum ignores much of the evidence and findings made at trial;
(2) the standard the district court used to review the evidence disregards the Supreme Court's remand and admonishment to look at the time of the child's birth when deciding whether a birth parent rebutted the presumption; and
(3) the memorandum fails to acknowledge the court's findings adverse to T.L.'s position that she acknowledged K.L. as a parent.

These arguments direct our attention to the evidence T.F. offered in rebuttal. As an appellate court reviewing a determination that must be based on clear and convincing evidence, we consider whether, after review of all the evidence viewed in the light most favorable to the prevailing party, the district court's factual findings are considered highly probable. In reviewing those findings, we will not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of C.L.*, 308 Kan. 1268, 1278-79, 427 P.3d 951 (2018).

Below is a summary of the rebuttal evidence offered by T.F.:

- T.F. selected her first sperm donor alone, attended her first insemination alone, and testified that she did not invite K.L. to the second insemination. T.F. testified it was not a mutual decision to have a child and she did not want K.L. there.

- K.L.'s last name was not included on the original birth certificate. T.F. added it as a concession to K.L.

- K.L. organized the baby shower but was not celebrated as a parent. Only T.F.'s name was on the invitation, which read:  "Baby Shower. In Honor of [T.F.] and Lil Feather."

- K.L. opened a bank account for M.F. after she was born and unbeknownst to T.F., K.L. unilaterally opened the account and listed herself as a parent. T.F. never viewed, signed, or otherwise authorized the account. K.L. only deposited $100 over two years that neither party used for M.F.'s benefit.

- K.L. only identified M.F. as her child on her employer's dependent beneficiary coverage summary form two years after M.F. was born, and weeks before she filed the petition to establish parentage. K.L. did not name M.F. as a beneficiary or dependent on any other official documents, including her medical and dental insurance.

- While K.L. sent a letter to T.F. referring to herself as "Mama K," K.L. sent the letter only to T.F. and thus it was not a "notorious" recognition of maternity.

- T.F. testified it was not a mutual decision to have a child. K.L. was 15 years older than T.F. and at a different stage in her life and scoffed at the idea of having a child. T.F.'s friend Elizabeth Avelar Hardyway testified accordingly.

- K.L. did not support T.F.'s decision to have a child, so T.F. sent K.L. cards where she referred to her as "Mamma K" and "mother" to encourage her to accept the decision. With respect to the Mother's Day card T.F. sent to K.L., T.F. sends those cards to many women in her life after she worked in a

14

Guatemalan orphanage where it was customary to refer to the women living there as "Mamma."

The district court said that the great weight of the witness testimony supported T.F.'s claims that she made the decision to have a child and found T.F. more credible in her assertions than K.L.

When viewed in the light most favorable to T.F., that finding is highly probable. K.L. is essentially asking this court to reweigh the evidence in her favor and find her more credible. But this court does not weigh conflicting evidence or pass on the credibility of witnesses. *In re Adoption of C.L.*, 308 Kan. at 1279. We hold that the district court did not err by finding that T.F. rebutted K.L.'s presumption of parentage by clear and convincing evidence.

*We find no abuse of discretion in the district court's holding that K.L. failed to meet her burden of proof.*

K.L. argues that the district court erred by finding that she did not establish a parent-child relationship. After finding that T.F. rebutted the presumption of maternity, the district court explained that K.L. was then required to overcome that rebuttal by showing something more than what was necessary to meet the initial presumption of parentage. "She must now show that she notoriously recognized her maternity, including the rights it would give her and the duties it would place upon her."

We review such question for an abuse of discretion. A judicial action is an abuse of discretion if

(1) it is arbitrary, fanciful, or unreasonable;
(2) it is based on an error of law; or

15

(3) it is based on an error of fact.

*Biglow v. Eidenberg,* 308 Kan. 873, 893, 424 P.3d 515 (2018).

Essentially K.L. argues on appeal that the district court's findings were not supported by the evidence. When a district court's decision is challenged for insufficiency of evidence or as being contrary to the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the verdict will not be disturbed on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011).

K.L. argues that she presented substantial evidence that she recognized the rights and responsibilities of being a parent:

- Testimony from her friend Jolinda Kelley that she and the couple discussed their plans for becoming parents before and after T.F. got pregnant.
- K.L. sent her friend Janet Brown a sonogram saying, "We're going to be mothers" and discussed motherhood with Janet many times. And Janet testified that she heard M.F. call K.L. "mommy."
- Testimony from the couple's neighbor Kenneth Von Feldt that
  o the couple talked to him about having a family before and after T.F. got pregnant;
  o he heard T.F. call K.L. "mom" and "mommy";
  o both of the women were motherly and took care of M.F.; and
  o both women were treated as mothers at M.F.'s first birthday party.
- Evidence that both T.F. and K.L. were sent Mother's Day and holiday cards from their families that alluded to both of them as parents.

16

K.L. argues that these facts, paired with the district court's findings that she met her initial burden of showing a presumption of maternity, show that she recognized the rights and responsibilities of being a parent. K.L. argues that the district court abused its discretion when finding otherwise and held her to an impossible standard. She asks this court to reverse the ruling of the district court and find that T.F. did not present sufficient evidence to rebut the presumption of parentage, but even if she did, that K.L. rebutted that rebuttal.

In response, T.F. argues that the district court properly found that K.L. did not establish parentage. She says K.L. essentially asks this panel to reweigh the evidence and find her more credible, which we cannot do because appellate courts may not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. See *Wolfe Electric, Inc.*, 293 Kan. at 407.

T.F. also notes that the district court's finding that K.L. failed to overcome T.F.'s rebuttal is a negative finding. She cites:

> "The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence of some extrinsic consideration such as bias, passion, or prejudice, the finding of the trial judge cannot be disturbed." *Cresto v. Cresto*, 302 Kan. 820, Syl. ¶ 7, 358 P.3d 831 (2015).

There is merit to this argument. And we see no obvious disregard of undisputed evidence by the district court in this record.

We decline K.L.'s invitation to reweigh this evidence. Both parties presented significant conflicting evidence on K.L.'s role in M.F.'s life. The district court heard all the evidence in a long trial and found T.F. and her witnesses more credible. The evidence supports the district court's finding that K.L. did not meet her final burden to show a

17

presumption of maternity. Thus, we affirm the district court granting T.F.'s motion to reconsider and finding that K.L. is not a parent of M.F.

Affirmed.